RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0261p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

WILLIAM TENNIAL,

                *Plaintiff-Appellant,*

    *v.*

UNITED PARCEL SERVICE, INC.; JIM COCHRAN;
MICHAEL SLABAUGH,

                *Defendants-Appellees.*

No. 15-6356

———————————

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:13-cv-02277—John Thomas Fowlkes, Jr., District Judge.

Argued: September 27, 2016

Decided and Filed: October 24, 2016

Before: GILMAN, GIBBONS, and STRANCH, Circuit Judges.

———————————

## COUNSEL

———————————

**ARGUED:** Luther Oneal Sutter, SUTTER & GILLHAM, P.L.L.C., Little Rock, Arkansas, for Appellant. John E. B. Gerth, WALLER LANSDEN DORTCH & DAVIS, LLP, Nashville, Tennessee, for Appellee. **ON BRIEF:** Luther Oneal Sutter, SUTTER & GILLHAM, P.L.L.C., Little Rock, Arkansas, Andrew C. Clarke, Memphis, Tennessee, for Appellant. John E. B. Gerth, Aron Z. Karabel, WALLER LANSDEN DORTCH & DAVIS, LLP, Nashville, Tennessee, for Appellee.

———————————

## OPINION

———————————

    RONALD LEE GILMAN, Circuit Judge. William Tennial is an African-American employee of United Parcel Service, Inc. (UPS) who has served in various managerial roles over

the course of more than 30 years with the company. After a number of service failures that occurred during his time as Hub Manager of the Memphis Hub's "Twilight Sort," Tennial was placed on a Management Performance Improvement Plan (MPIP) and eventually demoted to a supervisor of the Oakhaven Hub, a position that he currently holds. Although he acknowledges these service failures, Tennial points to a number of Caucasian managers who were allegedly responsible for similar failures, yet did not suffer comparable adverse employment actions. He therefore maintains that his placement on the MPIP and his subsequent demotion were in fact motivated by race, age, and disability discrimination, as well as by retaliation for taking medical leave.

Tennial brought suit in the United States District Court for the Western District of Tennessee against UPS and his supervisors, Jim Cochran and Michael Slabaugh. UPS, Cochran, and Slabaugh subsequently moved for summary judgment, which the district court granted on all claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**BACKGROUND**

**A.     Factual background**

In 2009, Tennial began working as the Business Manager of the Walnut Grove Packaging Center. His supervisors noted performance deficiencies and serious service failures at that facility over the next two years. Despite these service failures, Tennial contends that his performance was on par with other Caucasian managers.

In May 2011, Tennial became the Hub Manager of the Twilight Sort, where he worked under Hub Division Manager Richard Williams. Tennial's performance and leadership deficiencies persisted, and the Twilight Sort failed to meet performance goals under his supervision. He claims, however, that the Twilight Sort was in disarray before he took over and had failed to meet its performance goals for many years prior to his appointment.

In September 2011, the Twilight Sort suffered particularly severe service failures under Tennial's leadership, including an incident in which over 200 packages were not sorted in a timely manner. Tennial and Williams were summoned to Nashville to meet with UPS

supervisors and Ken Harms, UPS District President, in order to discuss the 200 delayed packages and other service failures at the Twilight Sort. Although Williams had previously supervised managers who missed loads, he had never before been summoned to the District President's office to explain this type of service failure.

Tennial alleges that Harms told him during the meeting that, unless he voluntarily stepped down as the Hub Manager, Harms would make it "extremely difficult for him to be successful." He refused to step down. Tennial now contends that Harms followed through on his promise and created an extremely hostile work environment. As a result, Tennial requested leave for stress, depression, and anxiety under the Family Medical Leave Act (FMLA) shortly after this meeting. He was granted leave and thus missed UPS's peak holiday season, which is the company's busiest. Tennial returned to his position as the Hub Manager of the Twilight Sort in early 2012.

After Williams's retirement later that same month, Cochran became the Hub Division Manager for Memphis and Tennial's direct supervisor. Cochran monitored and assessed Tennial's performance throughout March and April 2012. Numerous service failures were observed by Cochran, which Tennial claims were partly due to inexperienced supervisors, turnover, and a lack of capability at the Twilight Sort. In April 2012, Cochran and District Hub Operations Manager Slabaugh nonetheless decided to put Tennial on a MPIP. At a meeting discussing his MPIP, Tennial took responsibility for his service failures and committed to improving his performance. He also acknowledged that a failure to meet the goals stated in the MPIP could result in an adverse employment action, including a demotion.

Tennial thereafter failed to meet the goals of his MPIP. He was demoted in July 2012 from the Hub Manager at the Twilight Sort to Full Time Hub Supervisor at the Oakhaven Hub. Cochran testified that this demotion was performance-based, but Tennial maintains that the MPIP goals were impossible to attain because of the inexperienced supervisors at the Twilight Sort, a lack of support, unpredictable volume, and the desire of upper management to see him fail. Tennial further asserts that previous and subsequent Caucasian Hub Managers of the Twilight Sort also failed to meet performance goals, yet were not demoted like he was.

**B.      Procedural background**

In Tennial's complaint, he first alleged that the defendants discriminated against him based on his race, in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Tennessee Human Rights Act (THRA), Tenn. Code Ann. § 4-21-101 *et seq.*   He next brought claims under both the THRA and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623, for age discrimination, as well as claims under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, for disability discrimination.  Finally, Tennial alleged that the defendants interfered with his medical leave and retaliated against him, in violation of the FMLA, 29 U.S.C. § 2615.

UPS, Cochran, and Slabaugh moved for summary judgment on all counts in November 2014. Tennial opposed their motion and, in June 2015, filed a motion under Rule 56(d) of the Federal Rules of Civil Procedure asking the court to defer the consideration of summary judgment in order for him to supplement his response with additional discovery.  According to the motion, Tennial wished to depose three managerial-level UPS employees regarding incidents that had happened after the filing of the defendants' motion for summary judgment.   The defendants filed a response opposing Tennial's motion, claiming in part that the information that he sought to discover was irrelevant to his claims.

In November 2015, the district court granted the defendants' motion for summary judgment and denied Tennial's Rule 56(d) Motion.  Following this decision, the defendants filed a Bill of Costs with the Clerk of Court, seeking to recover permissible costs due the prevailing party under Rule 54 (d)(1) of the Federal Rules of Civil Procedure.  Tennial objected, arguing that the court should use its discretion and refuse to tax costs against him because the costs sought were unreasonable and unjustified.  In February 2016, despite Tennial's objections, the Clerk awarded costs to the defendants in the amount of $8,921.30.  This timely appeal followed.

**ANALYSIS**

**A.      Standard of review**

We review de novo a district court's grant of summary judgment. *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016). Summary judgment is proper when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this assessment, we must view all evidence in the light most favorable to the nonmoving party. *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016).

The denial of a Rule 56(d) request for additional discovery, on the other hand, is reviewed using the abuse-of-discretion standard. *Ball v. Union Carbide Corp.*, 385 F.3d 713, 720 (6th Cir. 2004). "An abuse of discretion occurs when the reviewing court is left with the definite and firm conviction that the trial court committed a clear error of judgment." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 623 (6th Cir. 2014) (internal quotation marks omitted). This means that we will not reverse the district court's ruling on Tennial's motion unless we conclude that the ruling was arbitrary, unjustifiable, or clearly unreasonable. *See id.* The abuse-of-discretion standard is also applicable to our review of the district court's decision concerning the taxation of costs. *Soberay Mach. & Equip. Co. v. MRF Ltd., Inc.*, 181 F.3d 759, 770 (6th Cir. 1999).

**B.      Racial-discrimination claims**

Although Tennial's claims of racial discrimination arise under different statutes, they can all be considered by utilizing the same analytical framework. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000) ("The elements of [a] *prima facie* case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981."); *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008) ("The analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims."). Under this framework, a plaintiff can prove racial discrimination by proffering

either direct evidence or circumstantial evidence. *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003). Tennial argues that he can establish a prima facie case for racial discrimination under both methods, so we will address each of them in turn.

### 1. Direct evidence

Direct evidence consists of facts that, "if believed, require[] the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id* at 865. In other words, when direct evidence is provided, no inferences are needed in order to conclude that racial discrimination is afoot. *Id.*

Tennial points to the following as direct evidence of racial discrimination: (1) Cochran's use of the word "n*****" in referencing another, nonparty UPS employee, and (2) a statement made by District President Harms during a meeting with Tennial, in which Harms used the word "boys" in reference to Tennial's black coworkers. Despite the derogatory nature of these words, the alleged comments do not constitute direct evidence of discrimination against Tennial.

The first comment is based on the bare-bones affidavit of a coworker, consisting of one sentence claiming that Cochran called the coworker a "n*****" while both were at work. Tennial was not present during this alleged incident. He next points out that the use of the word "boy" can be discriminatory, based on factors such as context, tone, and local custom. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (per curiam). But neither of these alleged comments was directed at or made in reference to Tennial, nor were they made in the context of his demotion. *See id.*; *see also Worthy v. Michigan Bell Tel. Co.*, 472 F. App'x 342, 347 (6th Cir. 2012) (rejecting as direct evidence of discrimination the use of the word "boy" when it was too remote in time to the adverse employment action).

A finding of racial discrimination based on these comments, moreover, would require us to make inferences. First, we would have to infer that Cochran's alleged use of the n-word with respect to an unrelated employee meant that his decision to demote Tennial was due to a similar racial animus. We would also be required to infer that Harm's reference to Tennial's coworkers as "boys" meant that his animus trickled down and influenced the individual decisions of Cochran and Slabaugh to initiate Tennial's MPIP and demotion process.

In sum, neither of these stray comments constitute direct evidence of racial discrimination against Tennial. His "direct-evidence" theory of liability therefore fails.

## 2. *Circumstantial evidence*

Alternatively, Tennial argues that there is enough circumstantial evidence to establish that UPS, Cochran, and Slabaugh discriminated against him based on race. We apply the burden-shifting approach from the *McDonnell Douglas* line of cases to analyze these claims under Title VII. Under this approach, Tennial must first establish the elements of a prima facie case. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). He has to show that he was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) replaced by a person outside the protected class or treated differently than similarly situated nonminority employees. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). If Tennial can establish these elements, then the burden shifts to UPS to articulate a legitimate, nondiscriminatory reason for his demotion. *McDonnell Douglas*, 411 U.S. at 802. Assuming that UPS has done this, Tennial can still survive the company's motion for summary judgment if he can "identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *See Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) (quoting *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007)).

Tennial met the *McDonnell Douglas* requirements to establish a prima facie case. As an African American, he is a member of a protected class and his demotion constitutes an adverse employment action. Tennial was qualified for the job of Hub Manager because he had over 30 years of experience at UPS and was transferred to that position by the company. *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 662–63, 666 (6th Cir. 2000) (holding that consideration of the employer's nondiscriminatory reason for the adverse employment action at the prima facie stage of the case improperly conflates the distinct stages of the *McDonnell Douglas* inquiry). Finally, Tennial meets the last prong of the *McDonnell Douglas* prima facie test because he was replaced as Hub Manager by a Caucasian.

The burden therefore shifted to UPS to come forth with a legitimate, nondiscriminatory reason for his demotion. *See McDonnell Douglas*, 411 U.S. at 802. UPS pointed to Tennial's failure to correct on-going performance deficiencies and his failure to meet reasonable expectations as set forth in the MPIP. This performance-based reason is supported by numerous performance failures at the Twilight Hub both before and after Tennial's MPIP process began, which he has acknowledged.

Because UPS put forth a legitimate, nondiscriminatory explanation for Tennial's demotion, the burden shifted back to Tennial to "identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination" in order to survive the defendants' motion for summary judgment. *See Provenzano*, 663 F.3d at 812. To show pretext, Tennial points to other Caucasian UPS managers who allegedly had comparable service failures, yet were not demoted. Although a plaintiff can prove pretext in several ways, evidence "[e]specially relevant to such a showing" is proof that an employer treated similarly situated Caucasian employees differently when they engaged in acts of comparable seriousness. *McDonnell Douglas*, 411 U.S. at 804. Tennial must therefore show that similarly situated Caucasian "comparators" were responsible for similar performance deficiencies, yet were not placed on a MPIP or demoted.

The nonprotected employee need not be identical in every way in order to be a proper comparator. Instead, the plaintiff must show that the comparator is similarly situated in all relevant respects and has engaged in acts of comparable seriousness. *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012). There is no specific list of factors that we must consider in making this determination. Instead, we must make an "independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee" based on the facts of the case. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Tennial put forth four potential comparators: James Fly, Jay Briggs, Bill Shadle, and Ann Hatley. He maintains that all of these Caucasian employees were responsible for performance failures, yet none were disciplined. For the reasons discussed below, however, we agree with the district court's conclusion that no reasonable jury could find any of these candidates to be adequate comparators.

Tennial first argues that Fly, who permanently replaced him as Hub Manager of the Twilight Sort in February 2013, is a proper comparator. Although Fly failed to meet performance goals during his first year as Hub Manager and has received reviews of "improvement needed," he has not been placed on a MPIP or demoted for failing to meet these goals. Differences in experience and disciplinary history, however, establish that Tennial and Fly are not similarly situated. *See Campbell v. Hamilton County*, 23 F. App'x 318, 325 (6th Cir. 2001) (holding that differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated). Fly had less than two years of management experience when he became Hub Manager and had worked in the Memphis Hub for only five years. Tennial, on the other hand, has over 10 years of managerial experience and over 20 years of experience at the Memphis Hub. Because of these differences, no reasonable jury could find that Fly and Tennial are similarly situated in all relevant respects.

Tennial next contends that Briggs is a proper comparator. Briggs was Hub Manager of the Twilight Sort before Tennial served in that position. Tennial argues that Briggs was a poor performer, but was not placed on a MPIP or demoted. He bases these assertions largely on an email from Slaubaugh, written after Slaubaugh observed the Twilight Sort under Briggs's management for only one day. In the email, Slaubaugh comments that the Twilight Sort had "the worst package handling" he had ever seen.

Tennial further claims that Williams, his former supervisor, transferred him to the "troubled" Twilight Sort so that he could fix the problems that Briggs created there. The record, however, reveals that this is a mischaracterization. Williams testified that Briggs was a strong performer and was transferred from the Twilight Sort to the Oakhaven Hub because Oakhaven was the biggest and hardest sort. In contrast, Williams said that Tennial was performing below average as Hub Manager from the outset and that Williams himself had considered putting Tennial on a MPIP.

True enough, the record reveals that Briggs had previously been asked to prepare corrective-action plans to address his performance deficiencies. But these write-ups are similar to the ones that Tennial completed with respect to his own performance deficiencies, which cuts against the argument that Tennial and Briggs were treated differently. UPS records also indicate

that Briggs improved and show that, during 2011 and 2012, Briggs was meeting his performance goals. Briggs, therefore, did not have the long-standing performance issues that Tennial did. So Briggs was not similarly situated to Tennial, nor did he have a record of comparable acts of serious performance deficiencies. No reasonable jury, therefore, could find Briggs to be a proper comparator.

Shadle, who replaced Tennial as Hub Manager of the Twilight Sort during Tennial's FMLA leave and briefly after his demotion, is offered as still another potential comparator. Tennial claims that, as his interim replacement, Shadle failed to meet the performance goals of a Hub Manager, but was not demoted. Despite Tennial's assertions, there is no record evidence to support this argument. Shadle, moreover, was a training manager, acting only as a temporary replacement for Tennial and not as a permanent Hub Manager. No reasonable jury could find Shadle to be similarly situated to Tennial in all relevant respects or that he engaged in acts of comparable seriousness.

Finally, Tennial argues that Hatley is a proper comparator. Hatley is the Hub Manager at the Oakhaven Hub and served in that capacity during 2011 and 2012 when Tennial was put on a MPIP and demoted. Tennial asserts that Hatley failed to meet her performance goals, yet did not suffer consequences similar to Tennial. Hatley's performance record, however, indicates that she did not engage in performance failures of comparable seriousness to Tennial's. In 2010 and 2011, the record shows that Hatley actually exceeded her performance goals. Although Hatley fell 39% short of one of her performance goals in 2012, Cochran did not put her on a MPIP plan because she had exceeded her goals in the prior two years. Hatley's performance errors, despite this singular failure in 2012, were neither as long-standing nor as serious as Tennial's. Because of these differences, no reasonable jury could find Hatley and Tennial to be similarly situated.

In sum, Tennial has failed to show that Fly, Briggs, Shadle, or Hatley are proper comparators. There is, moreover, no other evidence of pretext in the record. Because Tennial has failed to establish a genuine dispute of material fact with respect to pretext, his racial-discrimination claims were properly found to not survive the defendants' motion for summary judgment.

**C. ADEA claims**

Tennial also asserts that, as an employee over the age of 50, he has been subjected to discrimination based on his age. He brings his claims under the ADEA, which prohibits age discrimination in employment decisions. 29 U.S.C. § 623. Much like the cases under Title VII, a plaintiff who alleges employment discrimination under the ADEA may bring a claim using either direct or circumstantial evidence. *See Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Because Tennial presented no evidence of discriminatory age-related statements made by any decisionmakers, his claim must be analyzed under the approach used for circumstantial evidence.

That approach embraces the same *McDonnell Douglas* burden-shifting regime discussed above. *Id* at 622. Tennial was therefore required to show that (1) he is a member of a protected class, (2) he was demoted, (3) he was qualified for the position held, and (4) he was replaced by someone outside of the protected class. *Id*. Although Tennial was able to establish a prima facie case of age discrimination for essentially the same reasons as stated in Part II.B. above, the sole fact that he was replaced by a younger person is insufficient as a matter of law to raise a genuine dispute of material fact as to whether UPS's nondiscriminatory reason for demoting him was pretextual. *See Chappell v. GTE Prod. Corp.*, 803 F.2d 261, 267 (6th Cir. 1986) (holding that "[t]he isolated fact that a younger person eventually replaces an older employee is not enough to permit a rebuttal inference that the replacement was motivated by age discrimination"). The district court therefore did not err in granting summary judgment against Tennial on his ADEA claims.

**D. ADA claim**

We now turn to Tennial's assertion that his rights were violated under the ADA. As the district court noted, the record is unclear as to the specific nature of Tennial's disability. For the purposes of this analysis, however, we will assume that his work-related stress qualifies as a disability. Tennial alleges that he was subjected to discrimination because of this disability and because he was denied a reasonable accommodation.

He first asserts that his placement on a MPIP and the subsequent demotion were the result of disability discrimination.  To establish a prima facie case of disability discrimination, "a plaintiff must show that 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 258–59 (6th Cir. 2011) (internal quotation marks omitted). Furthermore, the disability must be a "but for" cause of the adverse employment action.  *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc).

Even assuming that Tennial was able to meet elements one, two, three, and five of a prima facie case, he failed to present proof that any of the defendants were aware of his disability.  An employee cannot be subject to an adverse employment action based on his disability unless the individual decisionmaker responsible for his demotion has knowledge of that disability.  *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th Cir. 2013). Although Tennial's supervisors were aware that he took leave, there is no indication anywhere in the record that his supervisors knew that this leave was for work-related stress.

A prima facie case is not made out if the decisionmaker is unaware of the specifics of an employee's disabilities or restrictions, even if the decisionmaker has a general knowledge that a disability exists.  *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 708 (6th Cir. 2015).  Despite Tennial's assertions, the record evidence shows that Tennial's supervisors, including the primary decisionmaker Cochran, were unaware of Tennial's stress-related disability.  His claim for disability discrimination therefore fails.

Tennial's related claim that he was denied a reasonable accommodation is similarly without merit.  He relies on a recorded conversation from a meeting with Cochran held after he was put on the MPIP. The key part of this recording is as follows:

> MR. TENNIAL: All right. I just wanted to talked [sic] to you.  Eventually I want to sit down because it seems like I'm having a hard time comprehending exactly what your expectations are.  So if you don't mind just -- of course, my ADA deal, I just wanted to ask you I had this –

MR. COCHRAN: Hold on. I don't want to be recorded. I never had anybody record me before. I mean, I will be glad to put it in writing exactly what, you know, what is expected. Guarantee your process, showing leadership.

MR. TENNIAL: You want me to turn it off?

MR. COCHRAN: Please do.

Tennial claims that the above interaction constituted a request for and a denial of a reasonable accommodation under the ADA. He contends that he needed a recording device because he was having trouble understanding what Cochran wanted. The recorder would have allowed Tennial to refer back to the conversation. Tennial admits that he did not further inform anyone at UPS of his request for an accommodation under the ADA, but insists that, during this interaction, he told Cochran that he was stressed out and needed a reasonable accommodation under the ADA.

To make out a claim for the denial of a reasonable accommodation, an employee must first show that he proposed an accommodation and that the desired accommodation is objectively reasonable. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008). Employees must not only "request to be accommodated, but [must] also provide their employers with a sufficient basis to understand that the request is being made because of their disability." *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 658 (6th Cir. 2016).

Although there is no bright-line test for determining when an employee like Tennial has made such a request, "at a minimum he must 'make it clear from the context that [the request] is being made in order to conform with existing medical restrictions.'" *Id.* (quoting *Leeds v. Potter*, 249 F. App'x. 442, 449 (6th Cir. 2007)). The district court correctly held that a fleeting reference to "my ADA deal" was insufficient to put Cochran on notice of an accommodation request. Tennial did not explain that the recorder would help accommodate his disability, and the record evidence indicates that Cochran did not understand his request as such.

And even if Cochran had understood Tennial's request as one for an ADA accommodation, Tennial's claim fails for a second reason. If denied a requested accommodation, an employee cannot force his employer to provide that specific accommodation if the employer offers an alternative reasonable accommodation. *Hedrick v. W. Reserve Care*

*Sys.*, 355 F.3d 444, 457 (6th Cir. 2004).  In the present case, Cochran offered to memorialize the conversation for Tennial in writing.  Tennial fails to explain why this would not constitute a reasonable accommodation.  Because Tennial has not met his evidentiary burden in showing that he made a request for an accommodation under the ADA, and because Cochran offered an alternative reasonable accommodation, Tennial's claims under the ADA are without merit.

**E.     FMLA claims**

Tennial next points to alleged errors in the district court's grant of summary judgment to the defendants on his claims under the FMLA.  The FMLA entitles qualifying employees up to 12 work weeks of leave under specified circumstances, including if they are suffering from a serious health condition.  29 U.S.C. § 2612(a)(1)(D).  This court has recognized two theories of recovery under the FMLA:  interference and retaliation.  *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012).  Although a plaintiff can proceed under both theories, the proof needed for each claim differs.  *Id.*  A plaintiff proceeding under a retaliation theory must show discriminatory or retaliatory intent, whereas a plaintiff alleging interference need not prove any unlawful intent on the part of his employer.  *Id.*  Tennial asserts that his FMLA rights were violated under both theories. We will therefore address each of them in turn.

Tennial first claims that his FMLA rights were interfered with when he was held responsible for the performance deficiencies of his interim replacement after he returned from leave.  To establish a claim for interference under the FMLA, a plaintiff must demonstrate that (1) he is an eligible employee, (2) the defendant is an employer as defined under the FMLA, (3) the employee was entitled to leave under the FMLA, (4) the employee gave the employer notice of his intention to take leave, and (5) the employer denied the employee FMLA benefits to which he was entitled.  *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

Analysis of the first four factors is unnecessary because Tennial has not pointed to any evidence in the record showing that he was denied FMLA benefits.  A benefit is denied if an "employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave."  *Arban v. W. Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003).  Tennial was never denied leave.  He was in fact granted it twice, once in 2011 when he was the Twilight Sort's Hub

Manager and again in 2012 when he served as a supervisor of the Oakhaven Hub. Nor was he denied reinstatement to those positions when he returned from leave.

Tennial also brings a retaliation claim under the FMLA. He asserts that he was retaliated against for exercising his FMLA rights because he was placed on a MPIP after he returned from leave in 2011. Tennial alleges that his placement on a MPIP and his subsequent demotion were not motivated by his poor performance, but because he took leave during UPS's peak holiday season. To establish a prima facie case of FMLA retaliation, a plaintiff must show that (1) he engaged in an activity protected by the Act, (2) this exercise of his protected rights was known to the defendant, (3) the defendant thereafter took an employment action adverse to the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action. *Id* at 404.

In order to establish such a causal connection, a plaintiff must show some type of retaliatory intent. Tennial therefore had to establish that the true motivation for his placement on a MPIP and his subsequent demotion were not for the reasons given, but were instead based on the fact that he took a medical leave of absence. *Id.* at 404. To prove this causal connection, Tennial points to two sources of evidence: (1) the timing of his demotion, and (2) his supervisors' hostility towards employees that take leave during the peak holiday season. But neither of these theories are supported by sufficient evidence from which a reasonable jury could find in his favor.

Tennial requested and was granted leave under the FMLA shortly after his September 2011 meeting with Harms, and he returned to work in early 2012. Following his placement on a MPIP and his failure to meet those performance goals, Tennial was demoted to supervisor status in July 2012. Despite this nearly seven-month period of time between his return to work and his demotion, Tennial urges us to infer that his demotion was actually based on the exercise of his FMLA rights. The district court correctly noted, however, that the gap between Tennial's return and his demotion is too long to support such an inference. Temporal proximity of more than six months, standing alone, has not been found to support an inference of retaliatory discrimination absent other compelling evidence. *Nguyen v. City of Cleveland*, 229 F.3d 559, 566–67 (6th Cir. 2000) (noting that "cases that have permitted a prima facie case to be made based on the

proximity of time have all been short periods of time, usually less than six months") (internal quotation marks omitted).

Tennial contends, however, that there is additional evidence to support an inference of retaliatory discrimination. He points to the testimony of James Wherry, a former UPS division manager, who said that UPS has a policy of disfavoring employees that take leave during the peak holiday season. Wherry based this assertion on comments made to him by Wilson, Director of Human Resources at UPS, regarding an unrelated, nonparty employee. The weakness of this evidence is underscored by the uncontested fact that Cochran, not Wilson, made the decision to place Tennial on a MPIP and recommended that Tennial be demoted. We therefore agree with the district court that this evidence does not raise a genuine dispute as to whether a causal connection exists between Tennial's leave and his demotion. He was therefore unable to establish a prima facie case for retaliation.

In sum, the record does not support Tennial's FMLA claims based on either interference or retaliation. The district court thus did not err in granting summary judgment to the defendants on these FMLA claims.

**F.      Tennial's motion to stay the court's consideration of summary judgment**

Tennial also appeals the district court's denial of his motion under Rule 56(d) of the Federal Rules of Civil Procedure to stay consideration of the defendants' summary-judgment motion. Before summary judgment was entered, Tennial became aware of other instances of UPS's allegedly preferential treatment of managers outside the protected class. Specifically, Tennial sought to depose three Caucasian managers who purportedly committed serious integrity violations but did not suffer similar adverse employment actions. Information discovered in these depositions, he argues, would likely be relevant under *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 751 (6th Cir. 2012) (defining a comparator as an employee who is similarly situated in all relevant respects to the plaintiff and has engaged in acts of comparable seriousness). Although Tennial failed to elaborate, he seems to be arguing that these employees could potentially serve as comparators under *Bobo*. Because the conduct in question happened soon after the close of discovery and is potentially relevant to his claims, Tennial argues that the

district court should have granted him leave to supplement his response before ruling on the defendants' summary-judgment motion.

The district court denied Tennial's motion, holding that the potential new information was irrelevant and thus would not alter the outcome of the decision. This ruling was not clearly erroneous because key differences between this case and *Bobo* support the district court's conclusion. As *Bobo* makes clear, Tennial must show that the proposed comparators' conduct was similar in kind and in severity to his own. *See id.* They must "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *See Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002).

Such similar conduct does not exist in the present case. Tennial's demotion was the result of his poor performance as a Hub Manager, whereas the three employees in question are alleged to have engaged in "serious integrity violations." Even if this misconduct occurred and did not result in adverse employment actions for these employees, their alleged integrity violations are materially different in kind from Tennial's performance-based conduct. These differentiating circumstances preclude them from being proper comparators. *See Parks v. UPS Supply Chain Sols., Inc.*, 607 F. App'x 508, 515–16 (6th Cir. 2015) (rejecting as comparators employees who had different disciplinary issues than the plaintiff) (internal quotation marks omitted). For these reasons, the district court's decision to deny Tennial's Rule 56(d) motion was not an abuse of discretion.

**G.     Order taxing costs**

Tennial's final argument is that the district court erred in taxing costs of $8,921.30 against him under Rule 54(d) of the Federal Rule of Civil Procedure. He mentions this issue in an extremely cursory manner, however, devoting only two sentences in his entire brief to the contention. Tennial simply argues that the district court's ruling should be reversed because "the case was close and difficult" and because of the "relative economic disparity between the parties." There are no citations provided to the record or to any caselaw, and the issue is not mentioned or developed elsewhere in the brief.

This issue has therefore been waived under this circuit's caselaw, which states that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *See Barany-Snyder v. Weiner*, 539 F.3d 327, 331 (6th Cir. 2008) (citation and internal quotation marks omitted). As a result, we need not consider this issue on appeal.

## CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgement of the district court.