NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0301n.06

No. 23-5616

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 16, 2024
KELLY L. STEPHENS, Clerk

JACQUELINE WILLIAMS,

    Plaintiff-Appellant,

v.

MEMPHIS LIGHT, GAS & WATER,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE

OPINION

Before: KETHLEDGE, LARSEN, and BLOOMEKATZ, Circuit Judges.

BLOOMEKATZ, Circuit Judge. Jacqueline Williams sued her employer, Memphis Light, Gas & Water, raising sex discrimination and retaliation claims under Title VII. The district court granted summary judgment to the employer. Williams now asserts that the court below wrongly ignored some of her deposition testimony and otherwise misapplied the law. We agree that the district court improperly ignored some of Williams's testimony. But even when we consider all of the evidence in the record, Williams's employer is entitled to summary judgment. We therefore affirm.

**BACKGROUND**

I.    **Factual Background**

Jacqueline Williams works for Memphis Light, Gas & Water Division (MLGW), a municipal utility company. Because MLGW moved for summary judgment on Williams's Title VII claims, we recite the facts in the light most favorable to her. *See Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 779 n.1 (6th Cir. 2024) (citing *Palma v. Johns*, 27 F.4th 419, 423 (6th Cir. 2022)).

This litigation centers on Williams's work as an office clerk at MLGW's Hickory Hill location. She began working at Hickory Hill in December 2017, after working for five years at another MLGW office. In the five years preceding Williams's transfer to Hickory Hill, the company initiated discipline against her three times. The first time, Williams received a written reprimand for insubordination that MLGW later rescinded after a grievance process. The second time, Williams received a "non-disciplinary warning" for instigating an argument with a coworker and then directing her brother to call the coworker's pastor to complain about him. The third time, Williams was suspended without pay for five days because a different coworker said Williams called him a homophobic slur and falsely disparaged him to others in the office. Williams disputes the factual bases of these disciplinary incidents, but the details are not relevant to this case.

Shortly after the suspension, Williams successfully applied for a different position within MLGW located at the Hickory Hill service center. Williams's responsibilities there were administrative, primarily filing paperwork and answering customer calls. She reported to Mike Page and Keith Newbern. She was the only clerk in the office of about twenty employees. Most of the workers at the office were field technicians who arrived at the office in the morning and then went out into the field to assist customers. Occasionally, MLGW assigned field technicians to "light duty," which involved administrative tasks at the office. Except for Williams and one field technician, all the employees at Hickory Hill were men.

Williams's complaints about Hickory Hill primarily center around Newbern, her shift supervisor. She says his words and actions fostered a sexist environment in the office. Williams testified that Newbern referred to another woman as a "bitch" and frequently spoke negatively about his ex-wives and daughters. Williams Dep., R. 47-1, PageID 479–81. She also said that her union steward told her that Newbern called a female security guard a "two-dollar whore" because

the guard didn't let Newbern into the parking garage without his badge. *Id.*, PageID 481–82. Williams claims that although Newbern did not direct derogatory language at her, he denigrated her to the other employees in the office, causing them to avoid her and give her "mean looks." *Id.*, PageID 470–73. She says that the environment Newbern fostered emboldened a coworker to call her a "bitch." *Id.*

According to Williams, Newbern treated her worse than the male employees at Hickory Hill by strictly enforcing rules only against her. For instance, Williams alleges she was the only employee prohibited from using her personal cellphone at the office, driving company vehicles at will, choosing her own lunch time, and taking a forty-five-minute (as opposed to thirty-minute) break. She also says Newbern excluded her from monthly safety meetings that all the other (male) employees had to attend. Finally, Williams says that Newbern grew frustrated at how often she went to the bathroom. She claims that he limited her to using the bathroom only once a day and told her that she shouldn't have to use the restroom so often "as a female." *Id.*, PageID 469.

Furthermore, she contends that Newbern singled her out for unfair treatment in various other ways. On one occasion, Newbern stopped her from eating at a coworker's retirement party since she didn't contribute money for food. On another occasion, Newbern took the keys to the supply cabinet from Williams and gave them to a male employee. And he made a male employee the United Way contact for Hickory Hill, which Williams says was customarily assigned to the office clerk.

In April 2018, Williams became upset that her other supervisor, Mike Page, asked her to complete Newbern's performance reviews. Williams told HR that she was uncomfortable completing this task since it was Newbern's responsibility, not hers. She also complained that Newbern spoke poorly about her to the other employees in the office. Following a meeting with

an HR representative and the union steward, Williams agreed to work out of a different MLGW office for a temporary "separation cool down" period. Apr. 25, 2018 Email, R. 47-12, PageID 752.

During the time she was working away from Hickory Hill, Williams filed a formal internal complaint against both Newbern and Page alleging harassment on the basis of sex. Though Page's role is unclear, Williams wrote: "[T]he main violator is Keith Newbern, who should be moved to avoid creating [a] more hostile environment with or among employees. He's also creating isolation among employees." Internal Compl., R. 53-15, PageID 1609. To support her complaint, Williams attached a short note signed by a male employee, Nakia Rutherford. Rutherford reported that weeks before, Newbern asked him to step outside for a conversation. During the exchange, Newbern warned Rutherford about interacting with Williams, describing her as "a troublemaker, a problem" who "files charges on people." *Id.*, PageID 1610. Rutherford wrote, "[h]e advised me to not interact with her. This conversation with Keith Newbern made me very uncomfortable." *Id.* Newbern later admitted that during this conversation, he told Rutherford "he may want to be careful [around Williams] because of this 'Me To[o] Movement.'" Investigation, R. 53-4, PageID 1561.

Approximately a month after Williams filed her complaint, MLGW transferred her back to Hickory Hill on her request. Not long after, she was involved in a highly charged incident with Newbern. There are conflicting accounts of what exactly transpired. Williams claims Newbern became angry when she missed a phone call while in the restroom and that his response led her to fear for her safety, walk outside (with Newbern at her heels), and call the police. Newbern, however, asserts that Williams ignored the call despite being at her desk and that she walked out of the office unaccompanied when confronted. The police arrived but left without taking action, and Williams amended her internal complaint to include this incident.

MLGW investigated this incident along with Williams's broader charge of harassment. It interviewed witnesses to Newbern's conversation with Rutherford and the incident that prompted Williams to call the police and inquired generally about the environment at Hickory Hill. The company concluded there was "no evidence" to support Williams's claims that Newbern exhibited threatening, intimidating, or violent behavior towards her. *Id.*, PageID 1563. The investigation also revealed that Rutherford and Williams both lied to investigators about using a company vehicle to go to lunch, which violated MLGW policy. HR representatives met with Williams and her union representatives to discuss the conclusions of the investigation. Williams claims Newbern sat in on this meeting. The HR representatives explained that MLGW was suspending Williams without pay for five days because she called the police on Newbern under false pretenses and because she lied during the investigation about using the company vehicle to go to lunch.

In August 2018, Williams filed an EEOC charge against her employer based on her suspension, alleging sex discrimination and retaliation for her complaints to HR. She later amended the charge to include a low performance rating she received from Newbern in February 2019.

## II.    Procedural History

Williams sued MLGW, asserting claims under Title VII for disparate treatment, a hostile work environment, retaliation, and retaliatory harassment. MLGW filed a motion for summary judgment, then a motion to strike some of Williams's declarations that she'd attached to her opposition brief. The district court struck parts of the declarations and granted summary judgment to MLGW.

In its decision, the district court first noted a "global problem" that Williams based her allegations "solely on her unsupported conclusory deposition testimony." Op., R. 72, PageID 1771.

Still, the court proceeded under the assumption that Williams had established a prima facie case of disparate treatment based on her suspension without pay. But it dismissed the claim, concluding that Williams failed to show the company's nondiscriminatory rationale for disciplining her was pretextual. Williams's hostile-work-environment claim fared no better; the district court concluded that MLGW was entitled to an affirmative defense because Williams did not adequately utilize the company's reasonable procedures for addressing sexual harassment. Finally, the court rejected Williams's retaliation and retaliatory harassment claims, reasoning that Williams failed to adduce sufficient evidence that the harassment and negative actions she complained of were causally related to her HR and EEOC complaints. Williams timely appealed.

## ANALYSIS

Williams challenges the district court's decision to grant her employer summary judgment on her Title VII disparate treatment, hostile work environment, retaliation, and retaliatory harassment claims.[1] We review that decision de novo. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021). MLGW is entitled to summary judgment if "there is no genuine dispute as to any material fact" and therefore it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We construe the record evidence in the light most favorable to Williams and deny summary judgment if—through that lens—"the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Under this standard, we may consider Williams's deposition testimony if it contains sufficient factual content and is not conclusory. *See Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020).

---

[1] Williams attempts to raise two other challenges in footnotes. First, she contends that the district court wrongly struck portions of the declarations she submitted in opposition to summary judgment. Second, she argues that the district court prematurely granted the MLGW's motion for costs under Federal Rule of Civil Procedure 54(d)(1). Both arguments are undeveloped, and we need not consider them. *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006).

Thus, the district court improperly characterized Williams's reliance on her own testimony as a "global problem." Op., R. 72, PageID 1771. It is well-established that a plaintiff's testimony can provide a sufficient evidentiary basis to defeat summary judgment, even if it is self-serving. *See Moran v. Al Basit LLC*, 788 F.3d 201, 205 (6th Cir. 2015). We require the testimony to set forth "specific facts, as opposed to general allegations" or legal conclusions. *Viet*, 951 F.3d at 823 (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727.2 (4th ed. 2016)). We disregard testimony where plaintiffs baldly assert their belief that they have experienced discriminatory treatment. *See Arendale v. City of Memphis*, 519 F.3d 587, 605–06 (6th Cir. 2008). At times, Williams voiced that kind of opinion, but she also recounted specific events that occurred in her workplace. The district court, by describing Williams's recollection of events as "unsupported," effectively determined that she was lying. Op., R. 72, PageID 1771. Yet a court may not judge credibility at the summary judgment stage, and instead must view the record—including the opposing party's own testimony—in the light most favorable to the party opposing the motion. *See Wyatt*, 999 F.3d at 410 (citing *Anderson,* 477 U.S. at 255). We disagree with the district court's approach below. Instead, we evaluate whether, if a jury credits Williams's version of the events at her workplace and the other evidence she marshals, she has established any of the claims she asserts against her employer.

With this lens, we address each of these claims in turn.

## I.      Disparate Treatment

Title VII prohibits an employer from "intentionally treat[ing] a person worse because of sex[.]" *Bostock v. Clayton County*, 590 U.S. 644, 658 (2020). For her disparate treatment claim, Williams must show that the company took an adverse action against her because she is female. *See* 42 U.S.C. § 2000e-2(a)(1). Williams claims to have both direct and circumstantial evidence of

such discrimination. We analyze each of these forms of proof with a different analytical framework. Either way, Williams's disparate treatment claim does not survive summary judgment.

### A.    Direct Evidence

Williams first asserts that she has direct evidence of MLGW's disparate treatment. Direct evidence is testimony or other evidence which, if true, necessarily requires the conclusion that "unlawful discrimination was at least a motivating factor in the employer's actions." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 302 (6th Cir. 2016). It must be evidence that shows a Title VII violation on its face, without requiring any inferences. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) ("corporate decision maker's express statement" that they wish to treat the plaintiff worse because of a protected characteristic was direct evidence of discrimination). Accordingly, for an express statement to constitute direct evidence of disparate treatment it must— when read literally—include both (a) discriminatory animus and (b) an intent to take an employment action against the plaintiff on that basis. *See Tennial*, 840 F.3d at 302.

Williams points to various statements which she says are direct evidence of discrimination. None of them are. A coworker called Williams a "bitch," but that is not direct evidence of disparate treatment because, among other reasons, Williams does not allege that the coworker wanted to, or had the power to, change a term or condition of her employment because of her sex. *See id*. Newbern called one female employee a "bitch" and a female security guard a "two-dollar whore." These statements are problematic on many fronts, but they are not about Williams so they cannot be direct evidence of discrimination against her. Similarly, Newbern allegedly derided Williams to her coworkers, but she does not allege that he explicitly mentioned her sex in any way. These all may be disturbing comments, but they are not direct evidence.

### B.    Circumstantial Evidence

Williams identifies circumstantial evidence of her employer's sex discrimination. Circumstantial evidence is proof from which a fact finder can "draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). Here, the well-established *McDonnell Douglas* framework applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973); *Smith v. City of Toledo*, 13 F.4th 508, 514–15 (6th Cir. 2021). We begin and end our analysis at the prima facie stage, as Williams has not satisfied her burden of creating a material question of fact as to whether MLGW took adverse actions against her on the basis of her sex. *See Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981).

To make a prima facie showing of sex discrimination under a disparate treatment theory, Williams must show: (1) she is a member of a protected group; (2) she was qualified for her job; (3) she suffered an "adverse employment action"; and (4) the circumstances of the adverse action "give rise to an inference of unlawful discrimination." *Hunter v. Gen. Motors LLC*, 807 F. App'x 540, 544 (6th Cir. 2020) (quoting *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 364–65 (6th Cir. 2007)); *see also Smith*, 13 F.4th at 515. The parties do not dispute the first two elements, so we focus our analysis on the alleged adverse actions and any discriminatory inference.

*Adverse Action.* We first ask whether MLGW took adverse employment actions against Williams. Title VII protects employees from discrimination "with respect to [] compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Thus, for a Title VII claim, an employee must point to a change in an "identifiable term or condition of employment" that made her "worse off." *Muldrow v. City of St. Louis*, 601 U.S. ---, 144 S. Ct. 967, 974, 977 (2024). Applying this standard, the parties agree (as they must) that Williams's five-day

suspension without pay was an adverse employment action. *See*, *e.g.*, *Harper v. City of Cleveland*, 781 F. App'x 389, 394 (6th Cir. 2019) (citing *Smith v. City of Salem*, 378 F.3d 566, 575–76 (6th Cir. 2004)).

Williams contends that MLGW subjected her to adverse employment actions in two more ways, neither of which satisfy the *Muldrow* standard. For one, Williams argues that working away from the Hickory Hill office temporarily to avoid Newbern made her "worse off" because she could not "communicate directly with" her supervisors and instead had to email them. Appellant Br. at 40–41; Supp. Appellant Br. at 8. Given that she claims her supervisors were harassing her, we're not sure how this distance was disadvantageous, and she does not explain. But regardless, Williams agreed to temporarily work from another office while the company investigated her complaints; she was not forced to be there and could return at any time. *Cf. Muldrow*, 144 S. Ct. at 974–75 (discussing the plaintiff's forced transfer to a different position that was less prestigious, had a worse schedule, and offered fewer perks).

Next, Williams argues that Newbern's general conduct as her supervisor involved a plethora of adverse actions: that he excluded her from meetings, prevented her from eating at the retirement party without paying, prohibited her from driving company vehicles during work hours, and took away her office supply cabinet keys. But these actions did not affect "identifiable" conditions of her work. *Muldrow*, 144 S. Ct. at 974. The meetings Williams says Newbern excluded her from were not related to her role as an office clerk, so she was not made worse off by not having to attend them. And the singular instruction at the retirement party that Williams not eat food she did not pay for does not demonstrate a change in a term or condition at work. While we do not doubt that some social events could be a condition of one's employment, this allegation on its own does not create a material question of fact whether MLGW was ostracizing Williams

socially. Similarly, Williams does not explain how Newbern's policy on company vehicles harmed her; the one time she describes needing to drive for work-related purposes (when she went to a different office during the cooling period), the company allowed her to use its vehicles. And finally, while Williams claims that not having supply-cabinet keys made it harder to do her job, she does not explain how or why, so we are left to guess at how this may have made her worse off. As with the other allegedly adverse actions, it is not self-evident in this case that Williams has described a "disadvantageous" action impacting an "identifiable" part of her job. *Muldrow*, 144 S. Ct. at 974.

We note that at oral argument, Williams presented a new theory. She suggested for the first time that Newbern's rule that she only use the bathroom once a day was also an adverse employment action. Yet she did not address this argument in her briefing to the district court or to us—not even when we requested supplemental briefing to address the effect of the recent *Muldrow* decision on this case. That means her employer did not have an opportunity to respond to it in its briefing or point to evidence of a nondiscriminatory reason for the policy, as *McDonnell Douglas* dictates. She has therefore forfeited this argument on appeal. *See Resurrection Sch. v. Hertel*, 35 F.4th 524, 530 (6th Cir. 2022) (en banc).

*Inference of Discrimination.* Because Williams identified one adverse action—her suspension without pay—we next ask whether the record evidence creates a question as to whether MLGW's action is causally connected to Williams's sex. *See Hunter*, 807 F. App'x at 544. Sometimes an employee seeks to satisfy this element by showing that the employer treated employees who do not share the plaintiff's protected characteristic more favorably, even though they are otherwise similarly situated to the plaintiff. *See, e.g.*, *Smith*, 13 F.4th at 515; *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992); *Davis v. Monsanto Chem. Co.*, 858 F.2d 345,

347 (6th Cir. 1988) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)). We require the plaintiff's proposed "comparator" to be similarly situated to the plaintiff in "all of the relevant aspects." *Smith*, 13 F.4th at 515 (citation omitted). By "relevant" similarities, *id.*, we mean that the plaintiff must be able to identify a comparator without differences that could justify non-discriminatory disparate treatment. *See Mitchell*, 964 F.2d at 583.

Williams attempts to make this showing in two ways, neither of which succeeds. First, she points to Nakia Rutherford—the male employee who, like her, lied during MLGW's investigation of her complaint about Hickory Hill. The company punished Rutherford less severely than Williams, even though they both lied about using the company car to go to lunch. Following the investigation, the company gave Rutherford a disciplinary warning, whereas it suspended Williams without pay. Disparate punishment between employees with and without the protected characteristic can, in some instances, support an inference of unlawful discrimination. *See, e.g.*, *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 777 (6th Cir. 2016); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352–53 (6th Cir. 1998). But Williams and Rutherford are not similarly situated in key relevant respects, so he is not a proper comparator. As MLGW explained when it suspended Williams, she was being punished not just for lying to investigators about using the company car, but also for fabricating allegations of harassment that gave rise to the investigation itself. Further, unlike Rutherford, Williams had been disciplined by the company before, including a prior suspension without pay for harassing and denigrating another employee based on his sexual orientation. An employer's choice to impose a more severe punishment on a

repeat offender who engaged in more serious misconduct does not "give[] rise to an inference of unlawful discrimination." *Jackson*, 814 F.3d at 778 (citation omitted).[2]

Second, rather than point to a specific comparator, Williams submits that "every male employee under Newbern was treated differently and more favorably" than she was. Appellant Br. at 33. She argues that the discriminatory rules that Newbern imposed at Hickory Hill—about safety meetings or bathroom breaks—raise an inference of sex discrimination. This argument fails because Williams does not connect Newbern's allegedly discriminatory policy to MLGW's decision to suspend her. Evidence of a "decision-maker's discriminatory animus" can sometimes raise an inference that a negative employment action was motivated by that animus. *Birch v. Cuyahoga Cnty. Prob. Ct.*, 392 F.3d 151, 166 (6th Cir. 2004) (citation omitted). But here, Williams does not dispute that the company's HR department, not Newbern, recommended and approved her suspension. So we need not analyze whether there is sufficient evidence of Newbern's discriminatory animus. *See Wyatt*, 999 F.3d at 420–21.

Williams did not produce evidence from which a jury could reasonably infer that the utility company suspended her because of her sex, so the district court properly granted summary judgment on her disparate treatment claim.

---

[2] The district court, relying on similar reasoning, determined that Williams had not established a prima facie case. Moving through the *McDonnell Douglas* framework, it also determined that even if Williams had established a prima facie case, MLGW had advanced a non-discriminatory reason for suspending her, and she had not shown this reason was pretextual. *See Smith*, 13 F.4th at 516. In Williams's case, the same evidence and reasoning is relevant at multiple stages of the *McDonnell Douglas* framework. *See id*. So "whether we deploy [our analysis] at the prima facie case stage, or at the point of showing pretext," we reach the same conclusion that Williams fails to show that MLGW's decision to suspend her was motivated by her sex. *Id*.

## II. Hostile Work Environment Claim

We next turn to Williams's hostile work environment claim. "A hostile work environment occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment . . . .'" *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also* 42 U.S.C. § 2000e-2(a)(1). Even if the record evidence creates a disputed question of whether the workplace meets this standard, an employer may assert an affirmative defense to liability called the *Faragher/Ellerth* defense (named after the cases establishing it). *See Wyatt*, 999 F.3d at 412. For the defense to apply, the employer must demonstrate (1) "that it exercised reasonable care to prevent and correct [the hostile work environment] promptly"; and (2) that the plaintiff "unreasonably failed to take advantage of" her employer's corrective measures. *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).[3] Like the district court, we conclude that MLGW is entitled to summary judgment on this defense. So even assuming Williams has shown that Newbern subjected her to a hostile work environment (which we do not decide), MLGW is not liable, as Williams failed to avail herself of MLGW's reasonable procedures to stop misconduct.

The first part of the *Faragher/Ellerth* defense requires an employer to demonstrate that it took "reasonable care" to prevent and address sexual harassment. *Thornton*, 530 F.3d at 456. MLGW can satisfy this element by showing it "promulgated an antiharassment policy with

---

[3] The affirmative defense is available when the "harassment does not result in a tangible employment action." *Wyatt*, 999 F.3d at 412. Newbern was not involved in the decision to suspend Williams, so that adverse action was not part of his alleged harassment. Williams does not argue otherwise, nor does she argue that the defense categorically cannot apply on this basis.

complaint procedure." *Ellerth*, 524 U.S. at 765. And Williams does not seem to dispute that MLGW maintained a "facially effective" policy that included a complaint procedure, and that it followed that policy upon receiving Williams's complaints. *Thornton*, 530 F.3d at 457. Specifically, Williams does not dispute that, as the district court found, MLGW "immediately opened an investigation and agreed to transfer Williams away from her alleged harassers if she so desired." Op., R. 72, PageID 1784.

The next question is whether Williams "unreasonably failed to take advantage" of her employer's remedial measures. *Ellerth*, 524 U.S. at 765. The district court concluded that the undisputed evidence in the record showed that Williams did not reasonably avail herself of these measures. We agree. Williams didn't report much of the conduct she now complains of—her email to HR that mentions a "hostile work environment" does not indicate she believed she faced sex discrimination, and only complains that Newbern and Page used crude language, spoke poorly of her, and gave her "dirty looks." Apr. 24, 2018 Email, R. 47-12, PageID 754. In her later-filed formal complaint of harassment, she did check off a box on the form indicating she was experiencing harassment on the basis of sex. But in describing the incident, she only identified Newbern as causing "isolation" and a "hostile environment with or among employees," and attached Rutherford's statement that Newbern told him to avoid Williams. Internal Compl., R. 53-15, PageID 1609. As the district court observed, there is "no evidence" that Williams reported "her claims of unequal lunches, breaks, or cell phone usage." Op., R. 72, PageID 1784. She did not even cite these in her amended EEOC charge.

By failing to inform MLGW of the scope of the harassment she says she faced or explaining how it was based on her sex, there is no way MLGW "knew or should have known" of the hostile

work environment Williams now complains of. *Jackson v. Quanex Corp.*, 191 F.3d 647, 664 (6th Cir. 1999).

Moreover, MLGW provided a corrective measure to Newbern's behavior by allowing Williams to work at another location during its investigation (including driving the company car there). But she voluntarily returned to the Hickory Hill office before the investigation was complete. Williams's hostile work environment claim stems from the conditions of being physically present at Hickory Hill under Newbern's supervision, so working elsewhere would have alleviated this "stress-producing" situation while the company investigated and resolved the issue. *Thornton*, 530 F.3d at 457. Indeed, Williams's most serious conflict with Newbern—the call to the police—occurred after her requested return to Hickory Hill. Because Williams did not take full advantage of the utility company's process for resolving her complaints at the Hickory Hill office, the company is not liable for claims of a hostile work environment there. *See id.*

Based on the record, the district court correctly determined that "there are no disputed material facts" concerning whether MLGW is shielded from liability under the *Faragher/Ellerth* defense and therefore is entitled to summary judgment on the hostile work environment claim. Op., R. 72, PageID 1785.

III.    **Retaliation and Retaliatory Harassment Claims**

Williams also claims that the utility company retaliated against her for complaining about sex discrimination and a hostile work environment. *See* 42 U.S.C. § 2000e–3(a). Specifically, she contends that after she reported Newbern's behavior to HR, and then later filed an EEOC charge, the company violated Title VII's anti-retaliation provisions in three ways: (1) it suspended her without pay; (2) it gave her a negative performance review; and (3) it subjected her to Newbern's pervasive harassment. We again analyze these claims under the *McDonnell Douglas* framework,

as Williams has not identified any direct evidence of retaliation. The district court concluded that Williams could not establish a prima facie case of retaliation for any of these three theories. And, again, we agree.

Williams's retaliation claims hinge on her ability to demonstrate a causal connection between her complaints of sex discrimination and her suspension, poor performance review, and harassment. A prima facie case of retaliation requires Williams to demonstrate that (1) she engaged in a protected activity, (2) her employer knew that she did, (3) the employer took an adverse action towards her or subjected her "to severe or pervasive retaliatory harassment by a supervisor," and (4) there was a causal connection between the protected activity and the adverse action. *Wyatt*, 999 F.3d at 419–20. All agree that the complaints are "protected activity" under Title VII and that Williams's suspension and poor performance review qualify as "adverse" under the statute. *Id.* And, as earlier, we assume without deciding that Newbern's harassment was "severe or pervasive" enough to be "adverse." *Id*. Because the only dispute is whether Williams has shown a "causal relationship" between her protected complaints about Newbern and the adverse actions she suffered, we examine each of her theories, focusing on causation. *Id*.

*The Suspension.* Williams fails to show a causal connection between the HR report and her suspension without pay. Williams emailed HR about Newbern's behavior in April 2018, and the company suspended her in August of the same year; a four-month gap. We have held that "temporal proximity considered with other evidence of retaliatory conduct is sufficient" to defeat summary judgment on the causation element of a prima facie case. *Little v. BP Expl. & Oil Co.*, 265 F.3d 357, 364 (6th Cir. 2001). And "very close" temporal proximity can suffice on its own. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). But Williams cannot rely on temporal proximity here. The four-month gap is too lengthy to independently establish causation.

*E.E.O.C. v. Ford Motor Co.*, 752 F.3d 634, 648 (6th Cir. 2014). And she does not identify "other evidence" in the record that ties Newbern's actions in the intervening four-month period to her eventual suspension without pay. The district court did not need to search the record for such evidence, and we have no obligation to do so on appeal. *See Sumpter v. Wayne County*, 868 F.3d 473, 489–90 (6th Cir. 2017); Fed. R. Civ. P. 56(c)(3).

*Poor Performance Review.* Williams also cannot show the HR report or her subsequent EEOC charge led to her negative performance review. Newbern gave Williams this unfavorable performance review in February 2019: six months after she filed a charge with the EEOC, and ten months after she emailed HR to complain. Williams acknowledges that the six-month period between the latest of these protected activities and her negative review is too long on its own to show causation under our precedent. *See E.E.O.C. v. Ford*, 752 F.3d at 648. But she maintains that she can rely on temporal proximity combined with the fact that February 2019 was the first chance Newbern had to take this type of adverse action against her, since performance reviews only happen once a year. She is correct that when the defendant takes an action at its "first meaningful opportunity," an otherwise lengthy lapse of time does not necessarily defeat causation. *Kirilenko-Ison v. Bd. of Educ. of Danville*, 974 F.3d 652, 665 (6th Cir. 2020) (citing *George v. Youngstown State Univ.*, 966 F.3d 446, 460–61 (6th Cir. 2020); *Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007)). But that dynamic doesn't absolve Williams of her burden to connect the adverse actions to her protected activities, which she fails to do. The only thing that Williams says demonstrates a causal relationship is "Newbern's pervasive negative and abusive treatment of her during the relevant period of time." Appellant Br. at 52. Yet she also says that "the harassment began" when she "started working with Newbern in his department." *Id*. Thus, she admits this behavior started

before she ever filed any complaints against Newbern, which defeats her ability to raise a material question as to causation.

*Retaliatory Harassment*. Williams's retaliatory harassment claim fails for the same reason. Because she alleges that Newbern began harassing her *before* she complained to HR or the EEOC, those protected activities could not have been the cause of his harassment. Williams does not allege that the harassment was worse after she filed a charge with the EEOC, or otherwise tie the harassment to her complaints. On this theory, too, her retaliation claim fails.

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of the district court.