NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0314n.06

No. 12-3673

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Mar 29, 2013*
DEBORAH S. HUNT, Clerk

JOSEPH C. NILLES,                                )
                                                 )
    Plaintiff-Appellant,                     )
                                                 )
v.                                               )   On Appeal from the United States
                                                 )   District Court for the Southern
GIVAUDAN FLAVORS CORP.,                          )   District of Ohio
                                                 )
    Defendant-Appellee.                      )


Before:       BOGGS, GIBBONS, and COOK, Circuit Judges.

        BOGGS, Circuit Judge.  Plaintiff-appellant Joseph Nilles filed a claim against his employer,

defendant-appellee Givaudan Flavors Corp. (Givaudan), alleging that his termination was the result

of disability discrimination, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C.

§ 12112, and Ohio Rev. Code § 4112.02(A).  Nilles also alleged that his termination constituted

illegal retaliation, in violation of the Family Medical Leave Act (FMLA), 29 U.S.C. § 2615.  The

district court granted summary judgment to Givaudan on all counts, and Nilles now appeals.  For the

reasons that follow, we affirm the decision of the district court.

**I**

        Givaudan is a manufacturer of scents and flavors that are used in foods, perfumes, and other

consumer products.  In 2003, Givaudan hired Nilles as a purchasing supervisor for its Cincinnati,

Ohio, and East Hanover, New Jersey, facilities.  Givaudan hired Jack Dabney in mid-2007 as its

regional purchasing supervisor, a position with supervisory authority over Nilles. In November 2010, Nilles, who was now responsible for purchasing at Givaudan's Carthage, Ohio, and Devon, Kentucky, facilities, told Dabney that he had received an offer for another job and used this offer as leverage to negotiate more favorable terms of employment with Givaudan. Givaudan was short-staffed and agreed to give Nilles an eight-percent increase in pay and to hire another employee to help with purchasing at the Devon facility. Soon after, Givaudan hired Nancy Fulmer, who took over purchasing at the Devon facility. Both Dabney and Nilles interviewed Fulmer, who had extensive experience in the flavor-purchasing industry, and Nilles himself recommended that Fulmer be hired. After completing her training, Fulmer held the exact position at the Devon facility that Nilles held at the Carthage facility, and, while Fulmer reported to Nilles for a few months during her training, she eventually reported directly to Dabney.

In 2008, several incidents occurred that prompted Dabney to talk with Nilles about his job performance. In September 2008, one of Nilles's subordinates, Kay Whitener, left Givaudan, stating in her exit interview that she "love[d] Givaudan" but that she had to leave given her "very difficult manager/subordinate relationship with Joe Nilles." While Whitener mentioned that her new job had a higher salary, she made clear "that money was [not] the driving force in my decision[, and that t]he main driving force is Joe Nilles." Specifically, Whitener complained that "[t]here is no effective communication within the very small purchasing group in Carthage" because "[a]s a manager, [Nilles] is horrible." In response to Whitener's comments, Deborah Pickering (sometimes referred to as Deborah Navarro in the record) of Givaudan human resources sent Dabney an email suggesting

that he develop "a plan of action with regard to [Nilles] before other people exit the company, or the perception of your department suffers more."

In his affidavit, Dabney stated that Nilles had "performance problems" throughout 2008, noting that Nilles's "communication and interpersonal skills were lacking, . . . [he] had problems being a self-starter[,] . . . requiring step-by-step instructions on how to proceed[, and his] project management abilities did not meet my expectations." Dabney asserts that he spoke with Nilles about these issues throughout 2008, a claim that Nilles does not deny except to point out that these conversations did not constitute formal discipline. Dabney also met with Nilles in February 2009 to conduct his annual evaluation, at which time Dabney discussed all the above-mentioned concerns that he had about Nilles's performance. Nilles claims that "he did not consider this review as any kind of warning that his performance was so poor that his job was in jeopardy," and he points out that "Givaudan paid [him] a merit-based bonus for his performance in 2008, which recognized his achievement of his annual objectives."

In response to these issues, Dabney and Pickering came up with a plan to terminate Nilles based on his poor performance. Before Nilles could be fired, they felt that Givaudan needed to hire and train a replacement for Whitener. Once this objective was met, Dabney and Pickering planned to transfer Fulmer to Nilles's job and also have her continue with her old duties managing the Devon facility until a replacement could be found. While it is unclear exactly when this course of action was formulated, Dabney indicated that the original plan had a "target completion timeframe of First Quarter, 2009," but that completion was delayed due to "the longer than anticipated timeframe

required for recruiting the new [replacement for] Kay Whitener."[1]  In addition, Pickering left Givaudan in 2009 and was replaced by Willie Spencer.  There are no emails in the record between Dabney and Pickering that describe their plan to terminate Nilles, and the most complete description of the plan is in an August 5, 2009, email that Dabney sent to Spencer catching him up on the plan and explaining why it had been delayed.  Spencer asserts that he had no input in Dabney's decision to terminate Nilles and that after Dabney informed him of the plan to fire Nilles, Spencer's only involvement was to recommend that Dabney compare Fulmer and Nilles—in order to ensure that Fulmer was the right person for Nilles's position—and to provide Dabney with an HR form for conducting this comparison.

Meanwhile, in July 2009, another of Nilles's subordinates, Scott Umphlett, resigned, stating in his exit interview that while he was leaving because he had received a "great opportunity and offer," Nilles was the reason he started looking for another job.  Umphlett provided a lengthy description of his issues with Nilles, reprising many of the problems Whitener and Dabney had already identified.

Following Spencer's recommendation, Dabney completed a formal comparison of Nilles and Fulmer and concluded that Nilles should be fired.  Dabney relayed this recommendation to his boss in Switzerland, Johannes Rogaar, who approved it perfunctorily.  On October 20, 2009, Dabney and Spencer informed Nilles that he was being terminated.

---

[1] Whitener's replacement, Nancy Lauer, was hired at the end of May 2009, and Dabney stated that "we needed to allow time for her ramp-up" before Nilles could be terminated.

Throughout this time period, Nilles had taken FMLA leave several times. In January 2008, Nilles took FMLA leave for a respiratory infection, and in late March and early April 2009, he again took FMLA leave, this time for dizziness and headaches. Both of these leaves, along with the payment of short-term disability benefits, were approved under the FMLA by Matrix, a contractor that administered leave for Givaudan. Furthermore, after each leave, Nilles returned to his previous position with full pay and benefits. Nilles learned during his second leave of absence that he had Multiple Sclerosis (MS) and told Spencer in April 2009. Nilles admits that he told no other employee at Givaudan about his MS and does not challenge Spencer's statement that Spencer "did not tell anybody" because Nilles "came to me in confidence . . . [and] asked me to keep it to myself." During his leaves of absence, Nilles told Dabney only that he was sick, that he was being treated by several doctors, and, at one point, that he was getting an MRI. In addition, only Nilles's symptoms—first an upper respiratory infection and later dizziness and headaches—were listed on his two requests for leave, with no mention of his MS.

After his termination, Nilles filed a complaint against Givaudan alleging, *inter alia*, disability discrimination, in violation of the ADA and Ohio Rev. Code § 4112.02(A), and illegal retaliation, in violation of the FMLA.[2] On March 1, 2012, Givaudan filed a motion for summary judgment, and the district court granted its motion on all of Nilles's claims. With respect to Nilles's disability-discrimination claims, the district court held that Nilles had failed to show that Dabney, the sole

---

[2] Nilles's original complaint also alleged illegal interference with his FMLA rights, in violation of the FMLA, and gender discrimination, in violation of Title VII and Ohio Rev. Code § 4112.02(A). On appeal, he does not challenge the district court's grant of summary judgment as to those claims.

decision-maker, had any knowledge of Nilles's disability and thus that Nilles had not established a prima facie case of disability discrimination. Turning to Nilles's FMLA retaliation claim, the district court held that Nilles had not demonstrated a causal connection between his taking FMLA leave and his subsequent termination and thus that he had failed to state a prima facie case of FMLA retaliation. Thereafter, Nilles timely appealed.

## II

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This court reviews the grant of a motion for summary judgment de novo. *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011). We must construe all evidence and draw all inferences against the moving party. *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009). However, "'[t]he mere existence of a scintilla of evidence in support of [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].'" *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 576 (6th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In this analysis, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III

### A

Title I of the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . discharge of employees." 42 U.S.C. § 12112(a). To make

out a prima facie case of disability discrimination under Title I through the use of indirect evidence,

a plaintiff must show:

> 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (internal quotation marks omitted). If a

plaintiff meets these requirements, "the burden shifts to the defendant to articulate a

non-discriminatory explanation for the employment action, and if the defendant does so, the burden

shifts back to the plaintiff to prove that the defendant's explanation is pretextual." *Ibid*.

In addition, "analysis of claims made pursuant to the Americans with Disabilities Act applies

to claims made pursuant to Ohio Revised Code § 4112.02." *Jakubowski v. Christ Hosp., Inc.*, 627

F.3d 195, 201 (6th Cir. 2010). Accordingly, disability claims brought under Ohio law may be

evaluated concurrently and under the same standards as claims brought under the ADA.

**B**

In the instant case, the district court found, and no party disputes, that the only element at issue

in Nilles's attempt to establish a prima facie case is whether Givaudan knew or had reason to know

of Nilles's disability. While Nilles argues that "the knowledge requirement is met if the legal entity

was on notice" of his disability, *see* Appellant Br. at 11, existing case law makes clear that an

employee cannot be considered to have been fired "on the basis of disability" unless the individual

decision-maker who fired the individual had knowledge of that disability, *see Burns v. City of*

*Columbus, Dep't of Pub. Safety, Div. of Police*, 91 F.3d 836, 844 (6th Cir. 1996) (holding that

plaintiff could not establish a prima facie case of disability discrimination because he had failed to show that the members of a review board that made the ultimate decision to terminate him knew of his disability); *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1181–82 (6th Cir. 1993) (holding that because "it was the Board of Directors, and not the president, who suspended plaintiff," plaintiff could not state a claim of disability discrimination where "[t]here is no showing that the Board had any knowledge of plaintiff's mental illness"); *Moloney v. Home Depot U.S.A., Inc.*, 2013 WL 460684, No. 11-10924, at *1 (E.D. Mich. Feb. 7, 2013) ("[B]ecause Keith Stevens made the decision to terminate Plaintiff's employment, . . . it is Stevens's knowledge, as the decision-maker, that is relevant."); *see also Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1185 (11th Cir. 2005) ("Once the issue is framed clearly, it is evident that an employee cannot be fired 'because of' a disability unless the decisionmaker has actual knowledge of the disability."); *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932–33 (7th Cir. 1995) (holding that lack of knowledge of decision-maker is fatal to a prima facie case under the ADA because "it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee 'because of' a disability unless it knows of the disability").[3] On this factor, Nilles has clearly failed to carry his burden of showing that Dabney, the sole decision-maker with respect to Nilles's firing, knew of his disability.

---

[3] While the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (codified as amended in scattered sections of 42 U.S.C.), changed the language of the Act from prohibiting discrimination "because of" disability to discrimination "on the basis of" disability, this does not affect the reasoning of the pre-2008 decisions with respect to decision-maker knowledge. It is equally true that an employee cannot be fired "on the basis of" his disability unless the individual firing him knows of that disability.

Nilles does not contest that Dabney was the sole decision-maker for his termination and admits that he told no one at Givaudan about his MS except Spencer. Furthermore, Spencer specifically stated in his affidavit that, at Nilles's request, he told no one else at Givaudan about Nilles's disability. Nilles presents no evidence to refute Spencer's statement or otherwise suggest that Dabney knew of his MS. Instead, Nilles argues only that a jury must be allowed "to evaluate whether Spencer's knowledge should be imputed to Jack Dabney." Appellant Br. at 12. "The mere existence of a scintilla of evidence in support of [Nilles's] position [is] insufficient'" to allow us to draw the speculative inference that Spencer lied in his affidavit and in fact did relay Nilles's medical information to Dabney. *Shropshire*, 550 F.3d at 576 (quoting *Anderson*, 477 U.S. at 252). Here, Nilles has produced even less than a scintilla of evidence and simply asks the court to disbelieve Givaudan's affidavits. This is untenable. *See Brown v. City of Franklin*, 430 F. App'x 382, 386 (6th Cir. 2011) ("[Plaintiff] contests [the fact that defendant knew plaintiff engaged in a protected activity] simply by contending that human resources 'must have told' [defendant] of [plaintiff's] statements [made in HR interviews]. This, however, is pure speculation, and [plaintiff] conceded that he has no evidence to undermine [defendant's] claim of ignorance."); *Burns*, 91 F.3d at 844 (holding that plaintiff had not established employer's knowledge of his disability because he "failed to present any evidence to contradict the affidavit testimony of the . . . Board members who claim to have been unaware of [plaintiff's] injury when they made their decision to recommend his termination").

In addition, Nilles asks us to assume that Spencer's knowledge can be imputed to Dabney because "Spencer advised Dabney regarding the consolidation of the purchasing manager positions." Appellant Br. at 12. The record contains no evidence, however, to dispute Spencer's assertion that

he only spoke with Dabney about the *process* for firing Nilles, as was his job as a human resources employee, and never made any recommendations on the *substance* behind Nilles's termination. Again, without any evidence to suggest that Spencer played a substantive role in Nilles's firing, Nilles cannot ask us to speculate that such conduct occurred.

Finally, Nilles argues that Dabney knew that Nilles was disabled because, given Nilles's two leaves of absence, Dabney knew that Nilles was sick. Knowledge of an employee's symptoms, however, does not necessarily equate to knowledge of his disability. *See Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999) (holding that employer had no knowledge of plaintiff's disability merely because employer knew of several of his symptoms); *Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 829 (S.D. Ohio 2004) ("Knowing that an employee has health problems, however, is not the same as knowing that the employee suffers from a disability."). Of course, if Nilles's symptoms were severe enough to alert Dabney that Nilles had a disabling condition, one might be able to conclude that Dabney knew of Nilles's disability or at least had some generalized notion that it existed. But in the instant case, Dabney only knew that Nilles had taken two leaves of absence, each for less than a month and separated by over a year, and that Nilles was seeing several doctors and had had an MRI. This information does not strongly imply that Nilles had a permanent disability and is just as, if not more, consistent with the perception that Nilles simply was suffering from one or more temporary illnesses.

Accordingly, the district court correctly held that Nilles failed to establish a prima facie case of disability discrimination under either the ADA or Ohio law and appropriately granted Givaudan's motion for summary judgment on those claims.

**IV**

**A**

The FMLA prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). This language has been read as creating a cause of action against employers who retaliate against employees for taking FMLA leave. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). In order to establish an FMLA retaliation claim, a plaintiff must demonstrate:

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006). If a plaintiff satisfies this framework, "[t]he burden then shifts to [the defendant] to articulate a legitimate, nondiscriminatory reason for [plaintiff's] discharge." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). If the defendant is able to articulate such a reason, the plaintiff "has the burden of showing that the articulated reason is in reality a pretext to mask discrimination." *Ibid*.

**B**

In granting summary judgment for Givaudan on this claim, the district court held that Nilles had not demonstrated a causal connection between his taking of FMLA leave and his eventual firing. The district court reasoned that Dabney's plan to terminate Nilles, which was formulated well before Nilles's final taking of FMLA leave in 2009, demonstrated that the 2009 FMLA leave itself was not the reason for Nilles's firing. In addition, the district court noted that, even assuming there was no

plan to fire Nilles prior to his 2009 FMLA leave, Nilles's only other evidence of causation was the temporal proximity between his 2009 FMLA leave and his eventual firing. Observing that Nilles's last period of FMLA leave ended in April 2009 and that he was not fired until October 20, 2009, the district court stated that Nilles's termination "over six months after his last FMLA leave" was insufficient temporal proximity to establish causation.

We agree that if, as the district court found, Dabney had formulated a plan with Pickering some time in late 2008 or early 2009 to fire Nilles, this plan would have existed well before Nilles's second, 2009 FMLA leave and thus would discredit Nilles's claim that his termination was motivated by that leave. With respect to his earlier FMLA leave, taken in January 2008, while neither the parties nor the district court discussed the issue at length, it seems clear that this leave, taken more than a year and a half before Nilles's ultimate termination and almost a year before Dabney claims he and Pickering first formed their plan to fire Nilles, has an even weaker causal connection to Nilles's losing his job. In sum, Nilles's entire FMLA claim can quickly be disposed of if we credit Dabney's story that he and Pickering hatched their plan to fire Nilles before he took his FMLA leave.

On appeal, Nilles argues, as he did before the district court, that "there is no documentation of [Dabney's plan to terminate Nilles] in this record except [his] August 2009 email [to Spencer]." Appellant Br. at 16. Thus, Nilles asserts that there is a genuine issue of fact as to whether Dabney's plan actually existed, as "it could be that Nilles' performance improved such that termination was no longer warranted[] or it could be that the plan never existed in the first place." *Id*. at 16–17. In addition, the district court noted that Pickering's mention in an email of the need to form "a plan of action with regard to Joe" corroborated Dabney's story that he had developed a plan to fire Nilles

before he took his 2009 FMLA leave. Nilles claims that this was "an inference in favor of the moving party, which is improper at summary judgment." *Id*. at 16.

All of these arguments fail for the same reason that Nilles's arguments concerning Dabney's knowledge of his disability fail. *See supra* Section III.B. Nilles fundamentally misunderstands the summary-judgment maxim that "all inferences are to be drawn in the non-movant's favor," essentially arguing that we must accept any remotely possible hypothetical that would further his cause and must disbelieve any statement from Givaudan that would hurt it. This is not the case. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (making clear that the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts"); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("[T]he party opposing [a motion for summary judgment] may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion." (internal quotation marks omitted)); *Hedberg*, 47 F.3d at 932 ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."); *see also Brown*, 430 F. App'x at 386; *Burns*, 91 F.3d at 844. Simply invoking the possibility that Dabney manufactured an elaborate story regarding a plan to fire Nilles and speculating that Dabney went so far as to fabricate his August 2009 email to Spencer in order to corroborate that story is not enough to create a genuine dispute of material fact. And the district court's observation that Pickering's email supported Dabney's story was a proper finding that Givaudan had presented a plausible rendition of the facts, one that Nilles had utterly failed to discredit.

No. 12-3673
*Nilles v. Givaudan Flavors Corp.*

Accordingly, Nilles could not establish that his termination was causally related to his taking

of FMLA leave, and he thus failed to state a prima facie case of FMLA retaliation.

**V**

For the foregoing reasons, we AFFIRM the district court's order granting summary judgment

to Givaudan.