NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0225n.06

Case No. 23-3660

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
May 30, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| MONTEZ MORTON, | ) | |
| Plaintiff-Appellant, | ) | |
|  | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
|  | ) | |
| GREATER CLEVELAND REGIONAL TRANSIT AUTHORITY, | ) | |
| Defendant-Appellee. | ) | O P I N I O N |

Before: STRANCH, LARSEN, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. Montez Morton, a former bus operator for the Greater Cleveland Regional Transit Authority ("GCRTA"), lost his job twice in 2020. After successfully obtaining reinstatement in the spring of that year, he was permanently terminated in late fall. Morton was first terminated after testing positive for a prohibited substance under GCRTA's substance abuse policy. He was terminated again after he knocked a passenger off of the waiting area platform and onto the train tracks of a commuter train as he awaited the train's arrival. Morton says that each of his terminations was attributable to discrimination—first disability discrimination then race discrimination. Morton filed suit against GCRTA, arguing that it violated the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq., ("ADA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., ("Title VII"), and the Ohio Civil Rights Act ("OCRA"), Ohio Rev. Code Ann. § 4112.02. The district court granted summary judgment to GCRTA on all of

Morton's claims. Morton timely appealed. Because Morton cannot make out a prima facie case for either type of discrimination that he has alleged, we affirm the district court's decision.

**I.**

Morton was employed as a bus driver for GCRTA from December 2015 until November 19, 2020. On January 23, 2020, GCRTA randomly selected Morton, pursuant to its Substance Abuse Policy for Safety-Sensitive Employees ("Substance Abuse Policy"), to complete a drug test. Morton's sample tested positive for amphetamines, a prohibited drug under Paragraph 11.4 of the Substance Abuse Policy. Section 11.5 of the Substance Abuse Policy states in relevant part:

> [w]hen an employee tests positive for a prescription drug which may affect his/her ability to perform the employee's job duties, s/he will be discharged unless the employee has provided the supervisor with notification from the employee's doctor of the use of a prescription drug and an indication of the employee's ability to perform his/her job duties without impairment.

(R. 18-1, PageID 310). Morton was aware of the requirement to disclose the use of prescription drugs in accordance with the Substance Abuse Policy. Indeed, on at least four occasions, Morton complied with the policy and submitted completed Prescription Drug Disclosure Forms divulging his use of Percocet and Tylenol #3. Morton concedes that he did not disclose his use of Phentermine to GCRTA before the January 23, 2020 drug test. Instead, the first time Morton disclosed the use of Phentermine was on a Prescription Drug Disclosure Form dated February 3, 2020—almost two weeks after the January 23, 2020 drug test. GCRTA ultimately concluded that Morton's failure to disclose his use of the prescription drug violated the Substance Abuse Policy, which warranted discharge.

Because Morton was a member of the Amalgamated Transit Union, Local 268 (the "Union"), a collective bargaining agreement ("CBA") governed the terms of his employment. Under the CBA, Morton was entitled to a pre-termination hearing where he, accompanied by and

with the assistance of a union representative, would have the opportunity to be heard. GCRTA suspended Morton pending a pre-termination hearing for violating the Substance Abuse Policy. Morton's direct supervisor at the time, Transportation Manager Sharon Sterrett-Sharp, presided over the pre-termination hearing on February 13, 2020. At the pre-termination hearing, Morton admitted that after he tested positive, he learned that a new medication he was taking, Phentermine, can cause a positive result for amphetamines. Following the pre-termination hearing, Sterrett-Sharp made the decision to discharge Morton for the policy violation. His termination was official as of February 14, 2020.

The CBA provided a three-step grievance process for terminated employees to dispute their termination. And employees still dissatisfied with the outcome after completing the grievance procedure would then be required to pursue any further remedies through binding arbitration. Morton grieved GCRTA's decision to terminate him. At Step Two, Chief Operations Officer/Deputy General Manager, Dr. Floun'say Caver—who served as the hearing officer— agreed with Sterrett-Sharp that Morton violated the Substance Abuse Policy because it was Morton's responsibility to notify GCRTA's Occupational Health Department of his prescription. But ultimately, Dr. Caver agreed to reinstate Morton's employment without backpay and to reduce his discharge to a first written reminder if he passed a drug test. Morton subsequently passed a drug test, and GCRTA reinstated his employment on April 23, 2020.

Morton's return to GCRTA was relatively short lived. On November 2, 2020, Morton struck a passenger in the face as he and the passenger waited for the arrival of a GCRTA commuter train. On that day, Morton's bus route ended near Little Italy in Cleveland, Ohio. After transferring his bus to a new operator, he went to the Little Italy Rapid Station (alternately, the "LIRS" or "Station") to take a train back to the Hayden District. Much of his movement after

arriving at the LIRS was captured on GCRTA's video surveillance system, which does not include audio. Morton arrived at the Station wearing his GCRTA uniform and a non-GCRTA branded coat over his uniform top. The video shows that as he climbed the stairs of the LIRS, Morton encountered a male passenger carrying a bag. Once on the platform, as the passenger walked ahead of him, Morton sped up and when he reached the passenger, they appeared to briefly exchange looks and words. Morton then stopped at a bench and put his bag down. The man continued walking on the platform past Morton. Once the man stopped further down the platform, Morton turned around and walked toward him. Morton first swiftly raised his arms at the passenger, which caused the passenger to flinch and slightly lift his bag. Morton then swung at the passenger, striking him on the head with enough force to knock him off the platform and directly onto the train tracks below. The passenger then stood up and moved to the other side of the tracks. Several seconds later, a train entered the station. The passenger waived at the train, and it stopped short of him. A few minutes later, Morton entered the train to ride back to the Hayden District. During the train ride, another GCRTA employee asked Morton if he hit the passenger who was now standing on the tracks to which he responded: "I sure as [f--k] did!" (*Id.* at 181–82).

Morton's then-supervisor, Transportation Manager Lisa Townes ("Townes") (African American), learned about Morton's altercation with the male passenger that same day. Townes reported to District Director Nicholas Biggar (Caucasian), and Biggar reported to Dr. Caver (African American). Townes reviewed a copy of the two applicable videos with Biggar. Townes and Biggar considered Morton's actions in the context of GCRTA's discipline policy, known as the "Positive Discipline Program." The Positive Discipline Program lists three levels of progressive, formal discipline in the following order from least to most severe: first written

reminder, second written reminder, and decision making leave ("DML") (i.e., a suspension). In conjunction with the Positive Discipline Program is the Employee Performance Code ("EPC"), which includes a section entitled, "Offenses That May Result In Immediate Discharge" ("Terminable Offenses"). The EPC includes the following under terminable offenses:

> [u]se of overt force, such as shoving, pushing, striking of any blows in any manner or fashion against another employee, supervisor, management personnel, or such actions against members of the public while in the course and scope of employment or any time while on company property.

(R. 19-1, PageID 405). The only exception to termination following an employee's use of overt force against a member of the public is "where it is clearly established that the employee acted in self-defense." (*Id.*). After reviewing the videos, Townes and Biggar determined they should proceed with a "Positive Discipline Approval Meeting" to evaluate terminating Morton's employment. (R. 19-2, PageID 443). After that meeting, GCRTA convened a pre-termination hearing before Townes on November 12, 2020. Townes terminated Morton's employment for striking a passenger in violation of Rule II of GCRTA's Employee Performance Code at the conclusion of the hearing.

During his pre-termination hearing and subsequent grievance hearings, Morton claimed that he felt threatened by the passenger and acted in self-defense. Morton also testified in his deposition that he was acting in self-defense. Four GCRTA officials disagreed. After independently reviewing the video footage, they each concluded that Morton was not clearly acting in self-defense for purposes of the EPC. Consequently, GCRTA denied all three of Morton's grievances and affirmed Townes's decision to terminate his employment.

On October 20, 2021, Morton filed a complaint against GCRTA in the United States District Court for the Northern District of Ohio alleging disability discrimination in violation of the ADA and OCRA and race discrimination in violation of Title VII and OCRA. GCRTA moved

for summary judgment. The district court granted GCRTA's motion and entered a final judgment on July 14, 2023. Morton timely appealed.

**II.**

We review de novo a district court's grant of summary judgment. *See Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016). "Summary judgment is proper when no genuine dispute of material fact exists[,] and the moving party is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(a)). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this assessment, we must view all evidence in the light most favorable to the nonmoving party. *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016). The central issue is whether the evidence presents a sufficient disagreement to require submission of Morton's claims to a jury or whether the evidence is so one-sided that GCRTA must prevail as a matter of law. *See Anderson*, 477 U.S. at 251–52.

**III.**

Morton maintains that the district court erred in granting summary judgment as to his disability and race discrimination claims because he has established a prima facie claim for discrimination and because GCRTA's reasons for terminating him were pretextual. Although Morton's claims of discrimination arise under different state and federal statutes, we can analyze both sets of claims by utilizing the same analytical framework. *See King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 560 (6th Cir. 2022) ("The Ohio [disability] anti-discrimination law mirrors the ADA, so this Court applies the legal standard under the ADA to claims brought under both laws.") (citing *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004)); *see also Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 760 n.1 (6th Cir. 2008) ("The Ohio

Civil Rights Act mirrors Title VII in all relevant respects for Plaintiff's discrimination . . . claims. Accordingly, we analyze Plaintiff's claims exclusively under a Title VII analysis, with the understanding that Plaintiff's success or failure in establishing a right to relief under Title VII necessarily would entail the conclusion that Plaintiff's claims must either succeed or fail under Ohio law as well.") (citing *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008)). Where, as here, the claim is based on circumstantial evidence, we employ the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007). Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014). If a plaintiff succeeds in satisfying the elements of a prima facie case, the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory rationale" for its actions. *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 298 (6th Cir. 2019) (internal quotation marks omitted) (quoting *EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018)). If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual. *See id.* We turn first to Morton's disability discrimination claim.

**A.**

*Disability Discrimination.* Morton maintains that GCRTA terminated his employment in February 2020 because he is disabled. His disabilities included liver disease, vision problems, and masses on his lungs. And according to Morton, GCRTA knew about these disabilities when it terminated his employment. "The ADA prohibits discrimination by a covered entity 'against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee

compensation[,] job training, and other terms, conditions, and privileges of employment.'" *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702–03 (6th Cir. 2008) (quoting 42 U.S.C. § 12112(a)). To establish a prima facie case of disability discrimination, a plaintiff must show: "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Id.* at 703 (internal quotation marks omitted) (quoting *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)). GCRTA disputes only the last two elements. Specifically, GCRTA argues that there is no evidence that the relevant decisionmakers knew or had reason to know of Morton's disabilities when they discharged him and that Morton was not replaced. We therefore limit our review to these two elements.

### 1. GCRTA's Knowledge of Morton's Disabilities

Our "existing case law makes clear that an employee cannot be considered to have been fired 'on the basis of disability' unless the individual decision-maker who fired the individual had knowledge of that disability." *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th Cir. 2013) (collecting cases). A decisionmaker must be aware of the "specifics of an employee's disabilities or restrictions." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016) (citing *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 708 (6th Cir. 2015)). In that vein, mere knowledge of an employee taking leave alone is insufficient to establish that the decisionmaker knew that the employee was disabled. *See id.* The burden lies with the plaintiff to show that a decisionmaker involved in his termination decision knew of his alleged disability at the time of termination. *See id.*; *see also Land v. S. States Coop., Inc.*, 740 F. App'x 845, 849 (6th Cir. 2018).

Morton asserts that because Concentra, GCRTA's third-party drug test administrator, knew about his disability, GCRTA's Occupation Health Team therefore knew. But as Morton acknowledged in his deposition, there was no evidence Sterrett-Sharp, his former supervisor who recommended him for termination for violating GCRTA's Substance Abuse Policy, knew about the three medical conditions underlying his disability discrimination claim. At the time Sterrett-Sharp made her decision, she knew Morton had a prescription for Phentermine because he discussed it at his pre-termination hearing on February 13, 2020. But there is no evidence that Sterrett-Sharp was aware of Morton's disabling conditions—namely, the masses on his lungs, his liver disease, and his vision problems. Morton asserts that he told GCRTA about his disabling conditions at his pre-termination hearing on February 13, 2020, but his deposition testimony about the hearing does not reflect that he did so. Moreover, the termination letter he received on February 14, 2020, merely states that Morton mentioned being on several medications for an "existing illness" during his pre-termination hearing; it does not note any disabling condition(s) or otherwise indicate that he reported his disabilities to Sterrett-Sharp.

Morton points us to Biggar's testimony that he became aware of Morton's "medical issues" during Morton's grievance process. (R. 19-1, PageID 406). But this testimony does not help Morton's cause. Biggar testified that he became aware of some of Morton's medical issues but was not aware of how many medical issues he suffered from or even what they were. More important, Biggar was not the decisionmaker for either of Morton's 2020 terminations. Sterrett-Sharp terminated Morton in February 2020, and Townes terminated Morton in November 2020. Even if Morton could establish that Biggar was a decisionmaker for his first termination, Biggar did not become aware of any of Morton's medical issues until after Morton was fired. And, to the extent that Biggar was aware of Morton's medical issues during the grievance process, such

"a general awareness of some symptoms is not enough to show that [GCRTA] knew of [Morton's] disability." *Messenheimer v. Coastal Pet Prods., Inc.*, 764 F. App'x 517, 519 (6th Cir. 2019) (citing *Nilles*, 521 F. App'x at 366, 369).

Accordingly, Morton has failed to show that the decisionmaker responsible for his termination knew or had reason to know of his disabilities.

## 2. Whether GRTCA Replaced Morton

Morton argues that he was replaced after he was terminated when his route was permanently reassigned to another bus operator. But the record does not bear out this claim. "Where a plaintiff's roles and responsibilities are re-assigned or redistributed among current employees—as opposed to reassigned completely to one other employee—the position is not considered 'replaced.'" *Sukari v. Akebono Brake Corp.*, 814 F. App'x 108, 112 (6th Cir. 2020) (quoting *Webb v. ServiceMaster BSC LLC*, 438 F. App'x 451, 454 (6th Cir. 2011)). Here, after GCRTA terminated Morton's employment, it assigned his bus route to an "extra board." (R. 19-2, PageID 438–39). An extra board is made up of bus operators who cover other operators' routes because of sickness, maternity leave, or termination. Every three months, GCRTA bus operators choose their routes based on seniority. As part of this process, another bus operator chose and was permanently assigned to Morton's route within a few months of Morton's termination. But GCRTA's adherence to its standard procedures for assigning bus routes is not evidence that it completely reassigned his role to another employee, and Morton presents no evidence that GCRTA hired a new operator to replace him. As such, Morton has not established a prima facie claim of discrimination.

**B.**

*Race Discrimination.* Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). To establish a prima facie case of race discrimination, Morton must show that he: (1) is a member of a protected class; who (2) suffered an adverse employment action; (3) was qualified for the position; and (4) was replaced by someone outside the protected class or was treated differently than similarly situated, non-protected employees. *Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 510 (6th Cir. 2022) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)). GCRTA does not contest the first three elements, nor does Morton argue that he was replaced by someone outside of his protected class. Instead, Morton argues that he was treated differently from a similarly situated, non-protected employee named Patrick Rivera.

"[T]o be deemed 'similarly situated' in the disciplinary context, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Russell v. Univ. of Toledo*, 537 F.3d 596, 607 (6th Cir. 2008) (alteration in original) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). "[T]he weight to be given to each factor can vary depending upon the particular case." *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003). Notably, the "nonprotected employee need not be identical in every way in order to be a proper comparator. Instead, the plaintiff must show that the comparator is similarly situated in all relevant respects and has engaged in acts of comparable seriousness." *Tennial*, 840 F.3d at 304 (citing *Bobo v. United Parcel Serv., Inc.*, 665

F.3d 741, 751 (6th Cir. 2012)). We "must make an 'independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the nonprotected employee' based on the facts of the case." *Id.* (quoting *Ercegovich*, 154 F.3d at 352).

In November 2021, Rivera worked as a GCRTA transit police officer when he was involved in a physical altercation with a passenger at a rapid station after the passenger became aggressive and lunged at him twice in an attempt to strike him. Rivera used a defensive law-enforcement maneuver called a "check move" to create separation between himself and the passenger, causing the passenger to fall onto the tracks. (R. 30-1, PageID 1676–77). Although the passenger was able to immediately return to his feet, neither Rivera nor an accompanying officer assisted the passenger in getting off the tracks. In response, on April 5, 2021, Acting Chief of Police Michael Gettings issued DML to Rivera—the highest level of discipline short of termination. Rivera grieved his discipline through his union. His grievances were denied. But, during the binding arbitration that followed, the arbitrator found GCRTA's punishment too severe and reduced Rivera's discipline to a first written reminder.

In several relevant respects, Morton is not similarly situated to Rivera. First, Morton and Rivera did not report to the same supervisors at the time of their respective terminations. Second, Rivera was a transit police officer, not a bus operator like Morton. As a transit police officer, River was explicitly permitted to use the force "which is necessary and reasonable to affect lawful objectives." (*Id.* at 1694). Indeed, as Dr. Caver noted in his testimony, "[a] police officer may get into an altercation with a customer that could involve" "push[ing], shoving or tackling a passenger." (R. 19-4, PageID 505). Morton, however, was not allowed to use force under GCRTA's policy unless "it [was] *clearly established* that [he] acted in self-defense." (R. 18-1, PageID 289) (emphasis added). Thus, Morton's use of force was subject to a heightened standard

under GCRTA's policies. Further, Morton and Rivera did not engage in comparable acts of seriousness. Multiple GCRTA officials concluded that Morton was the aggressor in the conduct leading to his termination and that he did not "clearly establish" he was acting in self-defense, whereas GCRTA officials determined that Rivera acted "with great restraint" while dealing with a passenger who repeatedly lunged at him in an attempt to strike him. (R. 30-1, PageID 1685). Finally, Morton was off duty when he hit a passenger, while Rivera was on duty and used a defensive tactic to combat the aggressiveness of a passenger.

Although Morton argues that he and Rivera were similarly situated because they were both categorized as "safety-sensitive employees," this argument is unpersuasive. Focusing on this mutual designation ignores the fact that GCRTA utilized different standards in evaluating the use of force appropriate when interacting with the public for bus operators and transit police officers. And while Morton points out that neither he nor Rivera was permitted to exceed the level of force permitted by GCRTA, Rivera was not deemed to have exceeded his use of force. (*Id.* at 1676, 1685) (stating that Rivera's use of a "check move" is "generally an approved action" and that there was no evidence Rivera was not in accordance with GCRTA's use of force policy).[1] Instead, the technique he utilized on a passenger of that age in combination with his lack of spatial awareness, and his failure to assist the passenger who fell onto the tracks, were the reasons GCRTA issued discipline.

Accordingly, Morton has not shown that he and Rivera were similarly situated in all relevant respects. As such, Morton has not established a prima facie claim of discrimination.

---

[1] Prosecutors from the City of Cleveland later charged Rivera with assault, unlawful restraint, and dereliction of duty, but those charges were ultimately dropped.

Because Morton failed to establish a prima facie claim of either disability discrimination or race discrimination, our inquiry ends, and we need go no further in the burden-shifting analysis.

**IV.**

For the reasons set forth above, we affirm the judgment of the district court.